Good morning. All rise. The State of Illinois Public Schools 1st Division is now in session. Honorable Justice Daniel J. Pierce presiding. Good morning. Please be seated.  Would the attorneys who are going to argue please approach the bench, identify yourselves, and inform us of how much time you would like to argue. Good morning, Your Honor. Richard Kroner, yes, on behalf of the appellate. Give us 25 minutes, I'd appreciate it. Very well. Good morning, Your Honor. Richard Hellermann for the plaintiff in Appley, 1550 MP Road. And we would ask for the same time that the appellate had. Well, I'm going to cut it down a little bit. We don't want to make a morning of this. Understood. Okay. We'll give you enough time to present your argument. Okay. Now, the microphone, by the way, is for recording purposes, not for amplification. So if you can keep your voice up for our senior judges up here so we can hear what you have to say, it would be appreciated. Thank you, Mr. Kroner. Good morning, Your Honors. May it please the Court. I'd like to start off this morning with a subject that I would not normally start with, and that is to point out that every issue that we have raised on appeal in this case is an issue of law, and subject to de novo review. And there should be no mistake about that, but because this is an appeal from a judgment entered following a bench trial, I don't think the plaintiff could pass up the temptation to characterize it as a fact-based appeal. And consequently, if you take a look, for example, at the – because they want it subject to the clearly erroneous standard. They would like it subject to the clearly erroneous standard. It is not. It's a de novo appeal. The transparency of plaintiff's efforts in this regard begin at as early as page 5 of their brief, which sets forth the issues on appeal. And you'll notice that in each instance, the issue is described in terms of whether one or another determination that was made by the trial court was against the manifest weight of the evidence seduced at trial. That's a quote. Every single one of them says it was against the manifest weight of the evidence seduced at trial, for example. Plaintiff describes the first issue as, quote, where the trial court's determination that the lease was valid and enforceable was against the manifest weight of the evidence seduced at trial, thereby, I believe, attempting to reduce the determination to a question of fact rather than a question of law. The issue of appeal concerning the validity and enforceability of what we call the LPA, the lease purchase agreement, centers on whether the lease satisfied the statutory requirements of the Property of Unincorporated Association Act, and what I'm going to call throughout this argument, PUAA, P-U-A-A, just for short, and whether the LPA complied with the requirements of Local 726's bylaws. It is uncontested that the lease complied with neither. And that being the case, the issue on appeal presents a question of law, specifically whether the LPA was void ab initio. Every issue in this case... Did the union have the authority to enter into a lease for a contract purchase property? Not without the vote of the membership. Well, but the president of the union had the authority to do that, but he needed the, under the bylaws, he needed the consent of the membership. No, under a bias. And under statute. Right. Right. But they had the authority to enter into the lease. Sure. Somebody always has the authority to sign the piece of paper. Right. But before you do that, you've got to satisfy the requirements of the statute and the bylaws, and particularly the statute, because common law, in common law, an unincorporated association couldn't hold property at all. Right. So the statute was enacted to allow them to hold property in their own name. Correct. Doesn't that mean it can be ratified by the members subsequently? No, it can't. Well, first of all, I don't believe that a contract that is void ab initio can be ratified. But if you entertain the notion that it can be, the only way it could be ratified is by a vote of the membership. And there was no vote of the membership. So if the vote of the membership is required to make the contract, at most, at least, a vote of the membership would be required in order to ratify the contract. And that didn't happen here. So ratification, you're just saving a couple of minutes around it because that's the argument on ratification. Ratification, I don't think you can ratify a void contract to start with. But even if you could, you've got to at least do what you would have had to do to make a contract to begin with, and that would be to obtain a vote of the membership. And that's not an insignificant requirement because, as I said, at common law, the unincorporated association could not hold property. It couldn't obtain it by lease or gift or any other way. It couldn't enter into that contract. And the reason was the ‑‑ But we're beyond that. The statute now allows an unincorporated association to own property in its own name. It does. Right. So we're beyond the common law. Well, we're almost beyond the common law. I just want to make one point. For how long of a period of time was the lease honored and complied with? I think eight months, but I'm not sure. I mean, there were a number of months where they honored and complied with the lease and paid the rent. But that doesn't say the lease. And, Your Honor, that's really why I go back to common law for a second. The statute's in derogation of common law. Consequently, it has to be strictly construed. You cannot come up with theories like ratification, waiver. Those theories don't work. You have to comply with the statute and the statute's very clear. Do you have any case that says that it cannot be ratified? I don't have a case that deals directly with ratification, but my point is it's an academic question to a large extent because the only way you could ratify would be to do what you had to do to begin with, and that would be get a membership vote. Ratification, you know, there's about eight issues in this case, all issues of law, and they're all issues in which the plaintiff wants to play defense, whether it's waiver or ratification or some other excuse, to get around what is a solid and appropriate rule. Because, remember, the liability of an unincorporated association resides in the members. The whole idea of common law is to protect members of unincorporated associations from liability by allowing people who are running the association to do things with buying the members. They're not like shareholders of a corporation. And so that's the reason why GORA has a specific requirement for membership, a membership commission, a vote of membership. It's not some formal insignificant requirement. And I know hard cases make bad law, and this may be one of those hard cases, where if this court comes down in the same way that the circuit court did, then you can forget about the requirement of the statute. All you need then is a series of events that would cause the person who's contracting with you to argue, well, you had a paired authority, or you ratified, or you waived. It can't be done. You have to comply with the statute. And the case that deals with that primarily is the condominium association case that we cited. Because in that case, the statute, there was a statute. It was the Condominium Association Act. And that act requires that the condominium association cannot enter into a contract unless it complies with its bylaws. And so there was a situation where the condominium association did everything that made it apparent that they had the authority. People on the board signed off on the contract. There was no question about the kind of things that normally suggest a paired authority. Nothing suggested about ratification in that case. But the court, I think over two years ago, this court, held in that case that that contract was void ab initio because it didn't comply with the Condominium Act. The reason it didn't comply with the Condominium Act is that the act requires that they act in accordance with their bylaws, and they did not. Those were uncontested issues. If we want to talk about issues of fact, I'll talk about two issues of fact that are uncontested. One is they never had a membership vote. And number two is a membership vote was required both by the bylaws and by the statute. Defendants have raised the issue that this was an issue that you didn't present to the trial court until the post-trial motion. Well, that's not correct. How do you respond to that? This was raised in summary judgment. This was raised in affirmative defenses in response to both the complaint and the amended complaint. The affirmative defense was that the contract was not lawful because it was not properly authorized. I think what they're saying is you didn't say the words CUA. You didn't cite the statute. That's not required. The Supreme Court has held even if you haven't raised it at the trial court level, you can raise it on appeal. We cited the case law in our brief. But putting that aside, we didn't wait for appeal here. They raised this with the defendants pretrial, the meetings that they had with the defendants, stating that there was no authority to intervene in this contract. There was no membership vote. It was raised during trial. It was raised in the affirmative defenses. It was raised in summary judgment. It was raised in the post-trial motions. How do you get waiver out of that? I don't understand their waiver argument. There was no waiver here. The ratification argument doesn't work. There's all kinds of excuses for why this decision should be upheld, but you have to get back to the basics, I think. The basics start and end with the requirement on the statute. Once you've dealt with that, you can move on to the other issues. I have to say that the issues of law here that permeate every single issue on appeal, I want to say two things about those. Number one, they don't have to win one of those issues of law. They have to win every one of those issues of law. They have to win every issue of law in this case, whether you're talking about waiver, ratification, whatever, and they have to win the primary issue, which is why you can just disregard the statute. Let's remember the buyer here, this is an uncontested fact, the buyer here had access to the bylaws that were given to him. He testified he didn't read them. So now we have a buyer who says, or at least a lessor who says, I got the bylaws, but I didn't read them. I know there's a statute, but I didn't read it. I know I'm presumed to know the law, but that doesn't count here either. I know I was represented by counsel when I entered into this lease. My counsel presumably knew about POA. My counsel should have at least reviewed the bylaws. I don't know why we're making excuses for the lessor here. There's no justification for walking away from the law, the statutory requirements, that are in derogation of common law. If we were in common law, it wouldn't have made any difference if any of these things happened because in common law you couldn't lease at all. Now, the statute says, yeah, you can enter into a lease, but you do have to have a membership vote. If you don't have it, that means you don't have a contract. The statute doesn't say that. The statute doesn't say you must strictly comply with the property of unincorporated associations. Does it? The condominium act does say you must strictly comply with your bylaws. The condominium act does say you must strictly comply with the bylaws. Judge, I don't know of a case where the avoidance of a statute is achieved by the absence of language that says here's what we require, you must do what we say. Okay. Let's move on to another point because you're running out of time. Your Honor, I can go through the cases. They argue this is voidable. It's not void. It's void after we see all of you don't comply. The regular argument Justice Harris just asked about, and I think I resolved that to my satisfaction. But yours, the ratification argument, thank you. You've asked about that. We've covered it. I think that covers most of the issues with the exception of damages. If there was error, a penalty clause. Well, what about the issue of successor liability? The argument of successor liability. Assuming the contract's enforced. Okay. Then the question is, should this contract be the liability of local 700? The contract on the circuit court's finding, the membership dues are not transferable. Am I on the subject here? Yes, I am. The circuit court found that there was an exception to successor corporate non-liability. In that, he found that local 700 was basically a continuation of 726 operations. And that there was a merger and consolidation of the two locals. Therefore, 700 took the lease with it. That's essentially what the finding is. I think that's a fair characterization of the finding. There are four exceptions to the successor liability. What's your point on the judge's finding on that? Well, the obvious first point is the one you've taken away from me, which is there's no contract here to begin with. Well, I said assuming. I understand that. As you do in your brief. And I do. There cannot be any continuity of ownership because the labor union does not have owners or members, only members. It's not like successor liability for a corporation. You have two unincorporated associations. No one in my case has applied this exception without a continuity of ownership. We don't have continuity of ownership. We have members. The members don't own it. The members are liable for it, liable for its obligations. So in a structure of an unincorporated association, you don't have successor liability. That's just an issue of law, and I think the court was wrong. So you're saying that the entire concept of successor corporate liability just is inapplicable to an unincorporated association? Well, I certainly think it's not applicable to local unions. And there is not a single case that we found where successor liability was imposed on a local union as an unincorporated association where it's made up of members but not owners. Typically, the requirement for successor liability derives from the fact that the corporate entity has owners and the owners get the benefit of the contract. There are federal district court cases under federal labor law that hold that successor unions are responsible for judgments against the predecessor union for discrimination. It matters to that. You're only correct about that, and I'm glad you pointed it out, because we're limited to discrimination cases. There is no single case that we have found that imposes successor liability from one local union to the next. There is one exception in the law that we have found, and that is the discrimination situation where the liability of the successor corporation is in a discrimination case but not the successor liability in a union case. But again, of course... Was there a merger? I beg your pardon? Was there a merger between the two unions? Well, no, there actually wasn't. 726 was dissolved by the international, and then the members were permitted, if they wanted to, to join 700. But they didn't have to. In fact, they don't have to join any union. Why doesn't this transaction become equivalent to a consolidation or a merger between the two unions? Well, because there was no merger. They didn't merge the boards. They didn't merge the members. There were a good number of members from 726 that joined 700, but that's their voluntary decision. They don't have to join 700, and many of them didn't. They can go to some other bargaining unit. They don't have to go to any bargaining unit. I'm sorry? See, collective bargaining agreements create just this whole different concept. A collective bargaining agreement is an agreement between the authorized representative, usually a labor union, and the employer for wages and conditions of employment, benefiting the bargaining unit. Benefiting the members of the bargaining unit. Well, right. The bargaining unit consists of employees within the defined unit. Yep. So this gets to my question about the whole issue of fraudulent transfer of an asset being a collective bargaining unit or a collective bargaining agreement. You know, there's federal bankruptcy laws that refer to the collective bargaining agreements as being situations where the union, as the authorized representative, holds a legal title to the collective bargaining agreements, but the equitable title lies with the members because the members can determine who their bargaining representative is. Illinois has their labor laws that deal with how the bargaining representative is selected and removed or decertified, but those are under restrictive circumstances. Right. Right. So what the International did here was, according to the record, investigated Local 726 for a period of time. The International Independent Review Board, a separate entity, investigated 726. The International decided, through a vote of its international board, to dissolve and revoke the charter of 726 and move all their operations over to 700. And that's what happened. So the collective bargaining agreements effectively had a substitution of 726 as the bargaining agent and inserted 700 as the bargaining agent. Nothing else changed. Apparently. I think the law is pretty clear, and we have cited it in a brief, that the assets of a local unit are not owned by the local. The collective bargaining agreements are the documents that identify the memberships of the various members. But, for example, in the Fraudulent Transfer Act portion of this case, the circuit court held that the transfer of the collective bargaining agreements was a fraudulent transfer of the assets. That's my point. Right. Whose asset is it? Is it an asset? It's not an asset of the membership. It's not an asset of the labor union because what they're talking about is transferring. What they're talking about is transferring the right to obtain dues from the members under the collective bargaining agreements. That requires a membership of each member, a decision of each member to elect to go to that unit. As you know, in this case, certain members of 726 never went to 700. That was their voluntary decision. The ones that did go. Do we really know that? I mean, the overwhelming number of members of 726 turned out to be members of 700. That's correct. But not identically everyone, I would assume. No, not everyone. And the point that the cases make, both federal and state, both the federal statute and the Illinois state statute, is that the asset, if you will, of the membership in the union belongs to the member. And you don't have, for example, if you're talking about a fraudulent transfer of the right to obtain dues from a member, that's not an asset that the local union has. The member has to make the decision to join that other local. Well, there again, that's where the labor law creates this confusion, at least in my mind. Under the collective bargaining agreements and under the statutes of the state of Illinois, where there's a collective bargaining agreement, the members of the bargaining unit have to pay at least their fair share or they can join the union. But as a result of the collective bargaining agreement, there is an obligation on the unit members to pay some dues, some portion of dues, or all dues if they join the union. That's true. Right. But they only have to pay dues to the local that they belong to. You don't have to be a member of the local to be required to pay some sort of fair share payment because you're a member of the bargaining unit. But that does not make it, Your Honor, an asset of the local. And for purposes of the Fraudulent Transfer Act, that's the issue. Right. If it's not an asset of the local, you can't fraudulently transfer that asset. One would think. One would think. And I believe the cases we've cited support that proposition. So with due respect, the point I'm making is that for a Fraudulent Transfer Act claim to be upheld, you have to have fraudulently transferred some asset. Right. And the establishment of another local that permits members voluntarily to go to that local is not the transfer of an asset. And the cases we cite uphold that proposition. They cite nothing contrary to our cases. We're talking about a Fraudulent Transfer Act claim. You have to transfer an asset to do that. The collective bargaining agreements are not assets of the local. And I'm glad you raised it because that was another issue here. The only other issues, and I'll be very quick, we'll stand on our brief on the damages question simply to state that if you have a contract that says you can recover your actual damages, and in addition to that, you have to pay the rent to the end of the lease, that provision that requires you to pay rent to the end of the lease is a penalty because you've already provided for actual damages. And that penalty is unenforceable. And there is a legion of case law in Illinois on that proposition. That was a major aspect of the damages provision in this case. There's no question that that damages provision is... If that provision is not applicable because it's a penalty, then how would one calculate damages? You calculate damages by determining how much you would have recovered during the life of the lease and then how much can you recover from another tenant during the lifetime of that lease. And that is classic mitigation. You've got to do it. This contract removed mitigation from the equation and permitted what many cases, all the cases we've tried, we've sent a dozen cases on this, that if you have a specific provision for actual damages and then you have another provision for additional damages, including in this case everything in the lease, that additional provision is an unenforceable penalty. And for the reasons that are stated in the cases, but I'm not going to... As you pointed out, we're short on time, but it's absolutely clear that this was a penalty clause. It could not provide a basis for damages in this case. I'm not going to get into Coley because I'll allow the... We'll stand on our briefs on Mr. Coley, other than to say that Mr. Coley deserved the same pass that the other members of the International got. On the privilege ground, he was still in exactly the same position they were. It should be recognized, the members of the court found that the other members of the International were not aware of any issues with respect to the lease, and the court found that given the fact they weren't aware of them, that means that Coley wasn't telling them of his concerns. So Coley's liability falls on that basis alone, but for the other reasons that we've identified in our brief, and I know I'm out of time, and so thank you very much for the time you've given us. There's other questions. Mr. Hellerman. Thank you very much. Thank you, Your Honor. Thank you. May it please the Court. I had what I thought was a pretty straightforward introduction to give to the three of you, but one thing that Mr. Prendergast said in his argument put all that aside. He said, I think it was upon Justice Pierce's questioning, there is no excuse from walking away from the law. I believe that's exactly what he said. What is so striking to me, on behalf of my client, is that that is precisely what Local 726 did. That's why we're here. They walked away from the law, this P-U-A-A. They walked away from everything that they were supposed to do, and they didn't just do it here with my client in a one-off transaction. The record at trial was undisputed. Not a single witness other than the three executive board members of Local 726, one of whom, Mr. Clark, signed this lease, that in 30 years of their membership in Local 726, half of which, for each of them, was about 14 or 15 years for each of them. I think Mr. Marcatanti was 17 years on the executive board of Local 726. Not one lease, and there were multiple leases because usually these were five-year leases, not one was signed by two people. Not one was put to a vote of a membership. Thirty years of leases. So who is it that Mr. Prendergast is talking about walking away from the law? But his own client. There's this statute that is supposed to protect, in theory, supposed to protect the unincorporated association and its members. And what did Local 726 do? They walked away from the law for this lease, for the lease immediately prior to this lease, which was fully complied with by Local 726. That was in evidence at trial. So this case is about our lease. Sure, that's going to be evidence at trial. We had the evidence at trial of the five years preceding our lease, signed solely by Mr. Clare, one signature, not two. Mr. Clare testified, as did Mr. Hurley, as did Mr. Marcatanti. In their history, 30 years, they had never seen the president of the union, John Falzone, at the time of our lease, sign even one lease. They never put these leases to a vote. The members usually just went where they went because that was their home. Now, it was easy back in the day because they were all in Teamster City anyway. So oftentimes they didn't have to physically move at all. But they had a new lease, and they were where they were. This lease was different because they were moving out of Teamster City. They were moving out of Chicago altogether. But the same walk away from the law, the same walk away from their own bylaws that Local 26 always did, they did yet again here. And now what's astounding is that they come before this court, and they're asked to be relieved of their obligation because they walked away from the law. What kind of alternative universe are they in? Well, 726 was dissolved. Yes, absolutely. That was the cause of the breach, right? It no longer existed. That's correct. But really the issue is, should 700 now be held responsible for their breach? Sure. That's the question. If we were to assume that they'll deliver you the lease, which I think you shouldn't assume it, I think you should find it, as Jared Mitchell did. And I think you should throw out the PUAA. As it turns out, Jared Mitchell didn't throw out the PUAA at all. He actually undertook a painstaking analysis using Supreme Court case law, talking about whether if there is even a violation of the PUAA, which again we submit that they waived it, not so much even at the trial of failing to raise it because I think their case law is correct, Justice Harris. You raised the question, well, they didn't raise it. And I think the case law is correct. As counterintuitive as it is, and I will get back to your question, believe me, I'm happy to talk about success or liability. Understood. But they didn't waive it by not raising it. I think they waived the statute not by not raising the trial as a defense, although we argued that because it seemed silly to allow them to talk about it only in the post-trial motion, and that's the first time that that came up. They talked about a failure during the trial. They didn't talk about the PUAA trial. So we have no ability at all to even move to exclude it in motions and limit it before trial. But their case law is old, but valid, that you don't waive a claim of illegality. Okay. That's not our claim at this point. At this point, the claim is that they waived it by their conduct. They waived the protection that this statute could have given them by walking away from the law, Mr. Prendergast's phrase, for 30 years, including with this lease. Anyway, success or liability. Mr. Prendergast just said to you there are no successor cases involving local unions, and you pointed out accurately that that's wholly untrue. There are lots of successor liability cases that happen not to be in the context of commercial leases. But so what? So what? The point is these unincorporated associations have been found to be successors of one another when situations arise where one goes away and one picks up. That's the concept. Now, what is the concept behind successor liability exceptions at all that allows for successor liability? Well, that's an easy one. Vernon v. Schuster, everybody knows that case. It's the Illinois Supreme Court case from 1997 that is the seminal case on successor liability. And that has been cited, scores, probably hundreds of times. A more recent case from this district from 2009 that we cited in our brief, DiGiulio v. Goss International, court of Vernon, and said this. The underlying theory of the exception to non-liability is that if the corporation goes through a mere change in form without a significant change in substance, it should not be allowed to escape liability. What did Becky Strahovski tell that IRB that Justice Pierce was talking about in connection with the decision to continue the trusteeship? What did she say about this lease? This lease imposes a multi-million dollar liability upon Local 726 that will never be backed off this local unless some other means is found to avoid this crushing financial burden. She told the IRB, we have to find another way to avoid this liability. The very thing that the Vernon Supreme Court decision said is exactly why there is successor liability. You can't just let entities find another way to avoid their liability. Judge Mitchell, at trial, was all over this point. He asked Robert Glock, who was both trial counsel and counsel at the time of the negotiations with Mr. Friedman, did you consider bankruptcy if this lease was such a terrible lease that was going to bankrupt the entity eventually? He said, did you consider going through the bankruptcy court, as Justice Pierce even talked about this morning? And he said, yes, we did. And then Judge Mitchell said, well, what happened? And he said, we decided not to go that route. They decided to take the law into their own hands. They decided to walk away from the law, the stupendous phrase, once again. And rather than go through the lawful and orderly discharge of liabilities that a bankruptcy court would provide them, they just decided to do it themselves and walk away from one liability. Interestingly, keeping every other liability that Local 726 had and bringing that over to 700. The one they didn't like, that's the one that, because of this dissolution and this shell game, became the liability of my clients that they walked away from. That's exactly why we have successful liability, to prevent that from happening. Well, why do you call it a shell game when Judge Mitchell found as a matter of fact that the other defendants, other union defendants, basically, all but Coley, were acting within their fiduciary responsibilities in deciding, after investigation by the International, after investigation by Joint Council 25, that they were going to dissolve 726 and create a new Local 700, consisting of only public sector employees and their public department employees. So, on the one hand, Judge Mitchell seemed to exonerate the basis for the dissolution and said it was proper or within the authority of the International to dissolve their affiliate Local. Is that what he did? Yes and no, Your Honor. Tell me the no part. The no part is easy. They didn't know about this lease. So, he didn't find that they had all this information and were none the less privileged. So, that gets to my point. You can't have a shell game if they didn't know about the lease. They did it for reasons other than the lease. That's exactly right. They did. Right. Okay. Who, however, knew about the lease? Coley. Coley. And he chose not to tell. And that sort of indicates that there was no motivation on the part of the International in the dissolution of 726 to avoid the lease. And that may be well why the International as a body and those individuals other than Coley were not held liable for interference with the contract. That was the claim against them. And the whole discussion by Judge Mitchell about their privilege to do it and it not being a shell,  He would agree that Coley could not dissolve 726 on his own. Unquestionably. Absolutely agree. It had to be the act of the International. Yes. By a majority of vote. Yes. Undisputed. Okay. So, that's what happened. So, it's now dissolved. Yes. They cannot perform under this agreement. Correct? Correct. Once dissolved, absolutely. Okay. So, the only recourse to get any recovery possible by the landlord is to go against 700. True. Right. So, tell us why that's the correct analysis by Judge Mitchell that there was successor corporate liability. Well, I just mentioned Mr. Housky's statement that we have to find a way to avoid this liability. Another way to avoid this liability. And then we have the Vernon v. Schuster case and the reasoning behind successor liability. Because it's not fair to find other ways to avoid these liabilities. 700 is, as you pointed out a few minutes ago, 700 is 726 plus some members from a different union, 714. They were in the same space on December 31 wearing a local 726 hat as they were on January 2nd of the very next year wearing a 700 hat. They were the same group of people, as you point out. Maybe 10 guys didn't join. Okay. They were the same group of people. There's no question about that. The collective bargaining agreements that 726 had entered into on behalf of its members with their employers had local 726 as the party. On January 2nd, that agreement wasn't changed. And we had the general counsel for local 700 saying, well, if anything had come up at any point in time before they were officially recognized, sometimes three months later, as long as 13 months later, they weren't recognized. 700 wasn't recognized as the new bargaining agent. When you say it wasn't recognized, you mean it wasn't formally recognized by the Illinois Department of Labor? Yes, it wasn't recognized. But the employers were recognizing it. Absolutely. That's the point. 700 is 726. It was. And it took them 13 months to even go to the Department of Labor and say, yeah, guess what? We're the new sheriff in town. But the problem with that is, who would know? Unless they were the same entity. They treated everything like they were the same with a different name. They went to my landlord. They went to 1550 and said, hi, allow us to introduce ourselves in a letter in January of that first year. We don't have a lease with you. We're the same people who were in the space last month, three days ago, 26 days ago. We're just not subject to your lease. They are the same entity. And by the way, Judge Mitchell found not only that they were a continuation, but he also found that it was for the fraudulent purpose of escaping liability. That's one of the other exceptions. There's an exception that Judge Mitchell did not even talk about really, which gets to a point that you raised a few minutes ago with Mr. Prendergast. How do we know it's a merger? Simple. Look at 726's tax returns. They say it under oath. How do we know it's a merger? Look at 700's tax returns. They say it under oath. Look at their financial statements. They say it. Now, they don't say it. Their accountants say it. Their accountants testified at trial. Their accountants said, oh, we want everything by the trustees when these locals are in trusteeship. No one seemed to know how the accountants came up with the words merger. How did Mr. Keagle, who was the secretary or the treasurer of the international union, right when they made this decision, encouraged by Mr. Coley, and Mr. Coley did fine, by the way, in this transaction, because when they moved out, they moved to his building that was owned by the pension fund of the local that he was the president of, and he was a trustee along with his son of that very pension fund. So why was Mr. Coley the one who's liable? Because he suggested the dissolution, and his local and his pension fund profited from it. Why would Mr. Coley want local 700 to pay 1550 rent for 14 years when he could just move them out at his say-so and have them pay it to himself? If that doesn't set up circumstances for interference with contract and having no privilege to interfere, nothing does. But back to successor, they called it themselves. But here's where I struggle with that analysis. On January 1st, 2010, 726 did not exist. Correct? Correct. It could not perform under this agreement. Correct? Correct. So how did Coley, on January 2nd, or in April, when he moved the operations of 700 from this building to another building, how could that have induced the breach that had already occurred? Oh, it doesn't induce the breach. His conduct in April, or as you said, the day after the dissolution and the breach, Coley didn't induce it then. Right. And he could not have interfered with the contract because it had already been breached. True. Those acts don't amount to the inducement or the interference. Those acts color his conduct prior to the dissolution, prior to the breach. But he could not, on his own, effectuate the dissolution or replication of the charter. You agreed to that. I will agree with it again, absolutely. Here's why he's liable. The case law we cited, that cat's paw theory of liability in the Seventh Circuit, and then the cat's paw case, which was a Posner case, was then extended by another case we cite, Smith v. Bray. It couldn't be any clearer. When one person, himself or herself, has no legal authority to take an action, it has to be done by a board. Okay? So there's your thought pattern, just like ours. Coley can't do it. The Posner case and the Smith v. Bray case, same facts. One person can't do it. It has to be a board. This person goes to the board, comes up with a bunch of reasons that are all legitimate on their face to take an action against, in that case it was a labor case, an employee, a fire employee. But he, this person, the bad actor, has a personal animus that is a discriminatory or bad or illegal animus. Okay? When that actor doesn't share the illegal animus with the board that makes the decision, shares a whole bunch of other reasons that might be legitimate on their face, and the board takes that action, but then it is later determined that there's an improper, illegal animus at the heart of everything, just unshared. You cannot say that the International or the Independent Review Board had reasons that were not legitimate for their purposes in dissolving 726. Right? Right. So under your analysis, the mere fact that Coley had this deep-seated, secret objection to this lease is enough to delegitimize the whole dissolution process. It doesn't make sense. You're talking only about the interference with contract land. You're not talking about succession liability, and you're not talking about... Personal liability against Mr. Coley. Right, which is only in the context of interference with contract land. Let me get to the point. Sure. You pled fraudulent transfer act violations as an alternative to your successor liability theory of recovery. Against the local. Yes, not against Coley. The only claim against Coley was interference. Right. But your complaint against all of them, especially the union defendants, was successor liability and then interference with the contract by the individuals. Not exactly. If you want to give me a couple of minutes, I can explain that briefly. Real briefly. Okay. Three claims in the case. Case started as a straight successor liability claim. Breach of lease, successor, 700. They're liable for the breach of lease. They're liable for the damages. That 726 would have been liable for under the breach. Okay. We also added a fraudulent transfer claim on the basis that 700, the new local, so to speak, was the recipient of fraudulent transfers of assets. And I want to, before I finish, I want to get back to assets. I know you talked about that with Mr. Prendergast briefly. So that's the second claim, that as the recipient of a fraudulent transfer, the recipient is liable for the value of the assets transferred to the extent that they can be... If you're successful in the successor liability theory of your case, the fraudulent transfer is necessary. Absolutely. They are not cumulative. It is one recovery for the amount of the unpaid rent for the remainder of the lease. So let's go to your assets. Okay. Assets. Again, Mr. Prendergast, consistent with the way that this union has been throughout this case, this is my alternative universe idea, nothing applies to them. They are bulletproof. The statute doesn't apply to them. They don't have to comply with anything, and yet they can then use that noncompliance to avoid the contract. Nothing applies to them. They can ignore, they can waive things, and that doesn't apply to them either. Well, here. Their tax returns state, under oath, they identify the assets transferred. On the revenue line of their tax returns is $3.7 million of dues. How is that not an asset? They're making this convoluted argument that, Well, the obligation to pay dues is not the same as the ability to be represented under a collective bargaining agreement, and it's voluntary. It is smoke and mirrors is what it is. These members of 726 became members of 700 overnight because 700 was born and 726 dissolved. So tell me about why a collective bargaining agreement is an asset of the union that was fraudulently transferred. Well, as I said, A, they said so in their tax returns. Did they list the collective bargaining agreements as an asset? They didn't list them specifically. They didn't list anything specifically. They said in statements, though, in the schedules, they said the assets of 726 were transferred to local 700 in the merger. Did they say including collective bargaining agreements? No. I would submit that that is never done in a tax return when you make a statement like that in the schedule. That's never done. Did they ever characterize collective bargaining agreements as an asset of the union? No. Case law. Did any of the international or the Joint Council 25 or COLE or 700 or 726 ever say collective bargaining agreements are an asset? Did they use that word? No, they did not. What they did do, what James Hoffa did, is said that dues are mandatory if you want to be represented under the CBAs, collective bargaining agreements. They're mandatory. So we have the volume, those dues, 3.7 million on line four, that come only with the transfer of the CBAs. If the CBAs come and if you are a member and want to be represented under that CBA, dues are mandatory. So how is it that dues that are mandatory, according to the president of the international, for the ability to be represented under the CBA and the CBA goes over, not only does it go over the 700, it goes over without even telling anybody. And their general counsel said, yeah, if something had come up in the 13 months before we made the change officially, we, 700, would have acted as 726. Okay, I'd ask you to wrap up your comments, please. Okay. All of them say this. My client, 1550 MP Road, LLC, is an innocent party here. He did what he does in his business. He found a prospective tenant slash buyer of a building who came to him saying, we'd like to be a tenant slash prospective buyer of a building. We will work with you on this. They did. Everybody was happy about it. The executive board of 726 came to visit the space while it was under construction 15 to 20 times before the lease was even signed. It cannot be argued. It would be wrong to conclude. It would be unfair to the nth degree to conclude that 1550 should be penalized because of the conduct of these local unions and Mr. Coley as well. But again, there's one recovery. So no matter which count is affirmed, and I think they all should be, any one of them puts my client, doesn't put him cold, but it certainly rights the wrong that was done to him. He did nothing wrong. They found a way to avoid the liability under the lease, which was what they were trying to do. They did it contrary to the law on successor liability. They did it by fraudulently transferring assets that showed up on the tax returns in a transaction that they called a merger, that they called a consolidation, that they called successors. And now they're somehow suggesting to this court that Judge Mitchell's analysis, which talked about all of the relevant law, is wrong. That's wrong. This should be affirmed. Thank you for your time. Thank you. Briefly, Mr. Perkins. Emphasis on briefly. Thank you, Your Honor. With respect to 700 and successor liability, which I think is the subject if the court has shown some interest, between 700 and 726, there was absolutely no continuity of management for officers and directors between local 726 and 700. Not a single officer or director of 26 remained an officer or a director of 700. There were significant continuity of employees between 726 and local. There was no significant continuity of employees between 726 and 700. 700 exited trusteeship in January of 2012 with only two former local 726 employees, among the 15 employees that were, the 30 employees that then existed. The former local 726 members comprised a minority of less than 40 percent of local 700's membership. The remaining members of local 700 were former local 714 members, which is totally unrelated to this case. That is not successor liability. That is not a successorship. Yes, they dissolved a local. Yes, they set up another local. Yes, the employees were given an opportunity to join that local. Some did. Some didn't. Most didn't. And then 40 percent joined. 40 percent of the new local consisted of old 726. That's correct. Most of the 726 went to 700. That's correct. That's correct. And let's suppose they never set up 700. Right. What would have happened? That they dissolved 726. Presumably they would have joined 714, but they would have gone out without any representation at all. We don't know. We don't know. And that's what we're talking about. When you're talking about successor liability, that's something you do know. You know what the successor company is going to be. Counsel said that the seminal case on this was – I forget the name of it. I had it right in front of me. What Vernon stands for is the proposition that once a corporation succeeds to the assets of another corporation by purchasing them, it doesn't purchase the liabilities. The liabilities don't go with it. He said that's the seminal case. And that's, by the way, a corporate case where you have shareholders. Here you have members. Now, these members, when they dissolved that, they ceased to be members. They became a member of another level. Whether that was expected to happen or not has nothing to do with successor liability. The obligation under the lease, under the case he cited just now, does not go to the so-called successor. So if there was a successor here, the liability doesn't follow. Now, counsel has said that's really unfair. And that's why I started off by saying hard cases make bad law, because that proposition of law is very fair as a general proposition of law that should be kept in mind in terms of unincorporated associations throughout the state of Illinois. And you do not chip away at the specific requirements of a statute and ignore it. In fact, I think his opening remark was that you should throw out the PUAA. The question of whether you should throw out, I don't know what that means. You can't throw out the PUAA. Finally, the idea that there was 30 years of experience in complying with leases on behalf of 726 has absolutely nothing to do with this case, nothing. It just means that when they entered into a lease, they pursued that lease. The fact that that lease was not the result of a membership vote meant, frankly, under the PUAA, that they could have walked away from it, but they didn't. The fact that they didn't walk away from a prior lease and they did walk away from this one is what they were perfectly permitted to do because that lease was void ad initio. That gets back to the starting point. Your honors have got to find that PUAA doesn't apply, that that lease is not void ad initio, in order to get to any of the rest of the rhetoric you heard this morning about fairness and what happened 30 years ago and all the rest of it. The statute applies. You have to comply with it. The case that the Allianz case is very clear on that and the other cases we've cited as well. Thank you very much. I appreciate your time. Thank you. We would like to compliment all the participants this morning in their analysis of the issues and the presentation through their briefs. It was very interesting and informative. Thank you all for that. And we will take the matter under advisement and the court stands in recess. Thank you.